Pamela S. AUSTIN, Plaintiff,

v.

FUEL SYSTEMS, LLC, Defendant.

No. 1:03–CV–374.

United States District Court,
W.D. Michigan,
Southern Division.

Aug. 16, 2004.

---

Jason S. Schnelker, Siebers Mohney, PLC, Grand Rapids, MI, for Plaintiff.

Jonathan P. Kok, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for Defendant.

---

## OPINION

QUIST, District Judge.

Plaintiff, Pamela S. Austin, sued Defendant, Fuel Systems, LLC, after Defendant terminated Plaintiff's employment. In her Complaint, Plaintiff claims that Defendant: (1) violated her rights under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.;* (2) discriminated against her on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.,* and Michigan's Elliot–Larsen Civil Rights Act ("Elliot–Larsen"), M.C.L. 37.2201 *et seq.;* and (3) discriminated against her on the basis of disability in violation of the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.,* and Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"), M.C.L. 37.1101 *et seq.* Now before the Court is Defendant's motion for summary judgment on all three claims. For the reasons stated below, the Court will deny Defendant's motion with respect to the FMLA claim and grant the motion with respect to the age and disability discrimination claims.

### I. *Background*

Borg–Warner Automotive was a predecessor of Defendant. In October of 2000, a temporary employment agency hired Plaintiff and provided her to Borg–Warner to perform work as an office manager. Borg–Warner itself hired Plaintiff as a full time employee in January 2001 and expanded the scope of her duties so that she worked both as an office manager and as a customer service representative. In April 2001, Defendant acquired the division of Borg–Warner that employed Plaintiff, and Defendant became Plaintiff's employer. In April 2002, Plaintiff began working exclusively as a customer service representative.

In the summer of 2000, Plaintiff began experiencing severe headaches, pain in her neck, and tingling along her left arm, hand, and fingers. Her condition deteriorated, and in July 2002, she was diagnosed as having an Arnold–Chiari malformation, a congenital defect in which the cerebellum portion of the brain protrudes into the spinal cord, resulting in pressure that causes symptoms such as those experienced by Plaintiff. Plaintiff informed Defendant of the condition in August of 2002, and was given a Request for Family Medical Leave Form. On October 7, 2002, Plaintiff officially requested FMLA leave in order to have surgery in hopes of relieving her symptoms. Defendant approved the leave request. Plaintiff began her FMLA leave on October 9, 2002, the day she underwent surgery. The procedure involved clipping away portions of Plaintiff's cranium and surrounding vertebrae to allow room for the brain malfunction to expand. The surgery, however, did not attempt to remove the malformation itself, which remained in place and is incurable. Plaintiff was discharged from the hospital on October 16, 2002, and went home to continue recovering.

On December 16, 2002, Plaintiff saw her doctor for a follow-up appointment. Later that day, Rick Claypool, Defendant's plant manager, telephoned Plaintiff to inquire when she would return to work. Plaintiff told Claypool that her doctor had not released her for work but that she had a

follow-up doctor's appointment on January 16, 2003 and would know more then. Plaintiff went to her appointment on January 16, and then went to Defendant's facility with a notice from her doctor stating that she would be able to return to work for four hours a day beginning January 20, 2003. On January 20, 2003, Defendant informed Plaintiff that her employment was terminated. Plaintiff was 44 years old on that date.

## II. Summary Judgment Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

A motion for summary judgment is properly supported if the moving party shows that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party makes its showing, the non-moving party must demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir. 1993). The court must draw all inferences in a light most favorable to the non-moving party when evaluating a summary judgement motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578–88, 106 S.Ct. 1348, 1352–58, 89 L.Ed.2d 538 (1986). It may, however, grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356).

## III. Discussion

### A. FMLA Claim

■ The FMLA permits eligible employees of a covered employer to take a total of 12 workweeks of leave during a 12–month period because of, among other things, a serious health condition that renders the employee unable to perform the functions of his or her job.[1] 29 U.S.C. § 2612(a)(1). Upon returning from FMLA leave, the employee is entitled to be restored to the same or an equivalent position. 29 U.S.C. § 2614(a). However, an employee who exceeds the permitted FMLA leave time has no right to be restored to his or her job. *See* 29 C.F.R. § 825.214(b); *Hicks v. Leroy's Jewelers, Inc.*, No. 98–6596, 2000 WL 1033029, at *5 (6th Cir. July 17, 2000); *Green v. Alcan Aluminum Corp.*, No. 98–3775, 1999 WL 1073686, at *1–2 (6th Cir. Nov.16, 1999); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 785 (6th Cir. 1998).

Under the FMLA, "an employer is permitted to choose any one of the following methods for determining the '12–month period' in which the 12 weeks of leave entitlement occurs":

(1) The calendar year;

(2) Any fixed 12–month "leave year," such as a fiscal year, a year required by State law, or a year starting on an employee's "anniversary" date;

---

1. It is undisputed that Plaintiff was an "eligible" employee, Defendant was a "covered employer," and Plaintiff's condition was a "serious health condition" as those terms are defined by the FMLA.

(3) The 12–month period measured forward from the day any employee's first FMLA leave begins; or

(4) A "rolling" 12–month period measured backward from the date an employee uses any FMLA leave.

29 C.F.R. § 825.200(b). The first and fourth methods of leave calculation are relevant in this dispute. The regulations explain that under the first method, known as the calendar year method, "an employee would be entitled to up to 12 weeks of FMLA leave at any time in the fixed 12–month period selected. An employee could, therefore, take 12 weeks of leave at the end of the year and 12 weeks at the beginning of the following year." 29 C.F.R. § 825.200(c). Under the fourth method, known as the rolling method, "each time an employee takes FMLA leave the remaining leave entitlement would be any balance of the 12 weeks which has not been used during the immediately preceding 12 months." *Id.*

An employer "will be allowed to choose any one of the alternatives in paragraph (b) of this section provided the alternative chosen is applied consistently and uniformly to all employees." 29 C.F.R. § 825.200(d)(1). However, if "an employer fails to select one of the options in paragraph (b) of this section for measuring the 12–month period, the option that provides the most beneficial outcome for the employee will be used." 29 C.F.R. § 825.200(e).

Defendant maintains that it chose and uniformly and consistently applied the rolling method (i.e., the fourth method in the list above). It is undisputed that if the rolling method is applied in this case, Plaintiff exceeded her authorized 12 weeks of FMLA leave. Defendant therefore moves for summary judgment on the FMLA claim, arguing that it was justified in firing Plaintiff. Plaintiff opposes the motion because, she asserts, Defendant

was required to notify her of its selected method and failed to do so, and thus her leave period must be determined using the method most beneficial to her. Under the calendar method, which Plaintiff seeks to apply, the clock starts afresh on January 1 of each year. Plaintiff did not exceed her authorized leave if the calendar method is used.

As the following discussion explains, the Court will deny Defendant's motion for summary judgment on the FMLA claim because the Court finds that Defendant was required to notify Plaintiff of the leave method and because whether Plaintiff received such notice remains a disputed issue of material fact.

**(1) Employers Must Provide Notice of the Method Selected for Calculating the 12 Weeks of FMLA Leave Entitlement**

The parties dispute whether an employer is required to notify employees of the method it has chosen for calculating FMLA leave. Defendant argues that the FMLA and its implementing regulations create no requirement to provide such notice. Defendant maintains that because it has applied the rolling method "consistently and uniformly" in accordance with 29 C.F.R. § 825.200(d)(1), it fulfilled its obligations and properly applied the rolling method in this case, regardless of whether Plaintiff knew of the method selected. In response, Plaintiff contends that employers are required to inform employees of the method chosen for calculating leave and that because Defendant failed to do so, it terminated her in violation of the FMLA.

**(a) The *Bachelder* Decision**

Plaintiff argues that the FMLA required Defendant to inform her about its method for calculating leave based on the rule

announced in *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1117 (9th Cir.2001) (holding that employers must inform employees of the method selected for computing FMLA leave). Defendant urges this Court to reject *Bachelder*, characterizing the decision as a non-binding and wrongly decided example of the Ninth Circuit "overstepping its constitutional authority" by "disregard[ing] the express language of the regulations" to create new legal requirements. (Def.'s Br. Supp. Mot. Summ. J. at 9.)

Nothing in the FMLA or its implementing regulations expressly requires employers to inform their employees of the method selected for calculating leave. Even *Bachelder* concedes as much. 259 F.3d at 1127. ("America West contends, correctly, that the FMLA's implementing regulations do not expressly embody a requirement that employers inform their employees of their chosen method for calculating leave eligibility."). The only express requirement for notification arises when an employer either changes its chosen method or fails initially to select a method but then later adopts one. *See* 29 C.F.R. § 825.200(d)(1) ("An employer wishing to change to another alternative is required to give at least 60 days notice to all employees."); 29 C.F.R. § 825.200(e) ("If an employer fails to select one of the options . . . .[t]he employer may subsequently select an option only by providing the 60–day notice to all employees of the option the employer intends to implement."). Despite the absence of an express notice requirement, the Ninth Circuit in *Bachelder* found such a requirement residing implicitly in the regulations. *Bachelder* appears to be only the court decision to "consider[ ] the issue of the notice requirement for a § 825.200(b) election." *Dodaro v. Village of Glendale Heights,* No. 01–C–6396, 2003 WL 1720030, at *7 (N.D.Ill. Mar.31, 2003). The court surveyed various passages of the regulations and concluded that "[t]he

only sensible reading of the regulations taken as a whole, therefore, is that an employer's 'selection' of a calculating method must be an open rather than a secret act, necessarily carrying with it an obligation to inform its employees thereof." *Id.* at 1128.

*Bachelder* began by examining the FMLA regulations' general notice provisions. First, 29 C.F.R. § 825.300 discusses "posting requirements." It mandates that an employer "post and keep posted on its premises, in conspicuous places where employees are employed . . . a notice explaining the Act's provisions and providing information concerning the procedures for filing complaints or violations of the Act with the Wage and Hour Division." *Id.* Employers may satisfy the posting requirement by "duplicat[ing] the text of the notice contained in Appendix C of this part." *Id.* The sample poster at 29 C.F.R. § 825 App. C does not mention anything about methods for calculating leave periods. Next, 29 C.F.R. § 825.301 sets forth "other notices to employees [that] are required of employers under the FMLA." This section lists different requirements for employers that publish written employee guidance in the form of handbooks, policies, or manuals, and those that do not. Employers that issue employee handbooks or similar documents are bound by 29 C.F.R. § 825.301(a)(1), which provides:

> If an FMLA-covered employer has any eligible employees and has any written guidance to employees concerning employee benefits or leave rights, such as in an employee handbook, information concerning FMLA entitlements and employee obligations under the FMLA must be included in the handbook or other document. For example, if an employer provides an employee handbook to all employees that describes the employer's policies regarding leave, wages, attendance, and similar mat-

ters, the handbook must incorporate information on FMLA rights and responsibilities and the employer's policies regarding the FMLA. Informational publications describing the Act's provisions are available from local offices of the Wage and Hour Division and may be incorporated in such employer handbooks or written policies.

Employers that do not publish employee handbooks, policy manuals, or similar documents are bound by 29 C.F.R. § 825.301(a)(2), which provides:

> If such an employer does not have written policies, manuals, or handbooks describing employee benefits and leave provisions, the employer shall provide written guidance to an employee concerning all the employee's rights and obligations under the FMLA. This notice shall be provided to the employee each time notice is given pursuant to paragraph (b), and in accordance with the provisions of that paragraph. Employers may duplicate and provide the employee a copy of the FMLA Fact Sheet available from the nearest office of the Wage and Hour Division to provide such guidance.

The paragraph (b) referenced above, 29 C.F.R. § 825.301(b), begins by stating that "[t]he employer shall also provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." The paragraph continues: "[s]uch specific notice must include, as appropriate":

(i) that the leave will be counted against the employee's annual FMLA leave entitlement (see § 825.208);

(ii) any requirements for the employee to furnish medical certification of a serious health condition and the consequences of failing to do so (see § 825.305);

(iii) the employee's right to substitute paid leave and whether the employer will require the substitution of paid leave, and the conditions related to any substitution;

(iv) any requirement for the employee to make any premium payments to maintain health benefits and the arrangements for making such payments (see § 825.210), and the possible consequences of failure to make such payments on a timely basis (i.e., the circumstances under which coverage may lapse);

(v) any requirement for the employee to present a fitness-for-duty certificate to be restored to employment (see § 825.310);

(vi) the employee's status as a "key employee" and the potential consequence that restoration may be denied following FMLA leave, explaining the conditions required for such denial (see § 825.218);

(vii) the employee's right to restoration to the same or an equivalent job upon return from leave (see §§ 825.214 and 825.604); and,

(viii) the employee's potential liability for payment of health insurance premiums paid by the employer during the employee's unpaid FMLA leave if the employee fails to return to work after taking FMLA leave (see § 825.213).

As *Bachelder* acknowledged, "these notice requirements do not explicitly require that employees be informed of the initial selection" of the employer's method for calculating leave eligibility. 259 F.3d at 1128. In fact, the regulation goes on to state: "The specific notice may include other information-e.g., whether the employer will require periodic reports of the employee's status and intent to return to work, but is not required to do so." 29

C.F.R. § 825.301(b)(2). But, *Bachelder* noted, the regulatory provisions quoted above contain wording broadly requiring disclosure of FMLA "rights and responsibilities" and "obligations," as well as an employer's "policies." The court construed this language as requiring "employers to notify employees of the choices they have made." *Id.* at 1127.

■■■ *Bachelder* also looked to an explanation that the Department of Labor issued when the final FMLA regulations were first announced:

> The purpose of this provision [i.e., the notice requirements of 29 C.F.R. § 825.301(a)(1)] is to provide employees the opportunity to learn from their employers of the manner in which that employer intends to implement FMLA and what company policies and procedures are applicable so that employees may make FMLA plans fully aware of their rights and obligations. It was anticipated that to some large degree these policies would be peculiar to that employer.

60 Fed.Reg. 2180, 2219 (Jan. 6, 1995).[2] More specifically, the Labor Department also stated in its explanatory comments: "Employers must inform employees of the applicable method for determining FMLA leave entitlement when informing employees of their FMLA rights." Id. at 2200. The *Bachelder* court read these sources as pointing to a conclusion that, just as

§ 825.301(a)(1) "requires employers to notify their employees of other policies adopted to comply with [the FMLA]," so too it "requires employers to notify their employees of this choice"-that is, the choice of method for calculating leave. 259 F.3d at 1127.

Having distilled a leave calculation method notice requirement from the FMLA's general notice regulations and statements the Labor Department made when issuing the regulations, the *Bachelder* court next proceeded to examine whether a notice requirement could also be found implicit in the "leave year" regulation. That regulation provides that "[a]n employer wishing to change to another alternative [for calculating employees' FMLA leave eligibility] is required to give at least 60 days notice to all employees." 29 C.F.R. § 825.200(d)(1). The 60–day rule, *Bachelder* opined, "demonstrates that employees are entitled to act in reliance on their employer's choice of a calculating method in, for example, scheduling elective surgery or deciding which spouse will stay home to care for a seriously ill family member." 259 F.3d at 1128. Extending the "reliance" logic, the court stated that "[e]mployees cannot reasonably act in reliance on an employer's initial policy choice if that choice was kept secret from them." *Id.* "Moreover," the court added, "notifying employees of a *change* of methods is only meaningful if they are aware that

---

**2.** The Court accords substantial deference to the DOL's advisory notes and commentary, which are "akin to an agency's interpretation of its own legislative rules"; "provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). *See also United States v. Cinemark USA, Inc.,*

348 F.3d 569, 578 (6th Cir.2003) ("As a general matter, deference should be given to an agency's interpretation of a regulation when the agency has been given responsibility to issue regulations under the statute in question, to explain the responsibilities of those concerned under the statute, and to enforce the statute in court."); *A.D. Transport Express, Inc. v. United States,* 290 F.3d 761, 766 (6th Cir.2002) (explaining that an administrative agency's interpretation of its own regulations is entitled to substantial deference unless it is plainly erroneous or inconsistent with the regulation).

another method was previously in use." *Id.* (emphasis in original) Therefore, the court concluded, "[f]or both these reasons, the regulations clearly contemplate that the employees not be kept in the dark concerning their employer's initial selection." *Id.* Although the notice requirements in the "leave year" regulations "do not explicitly require that employees be informed of the initial selection, they would be meaningless if the regulations as a whole allowed employers to conceal the initial selection from their employees." *Id.*

Progressing to the next step in its rationale, the court looked to the regulation providing that if an employer fails to select one of the four options for calculating leave, the employer "may subsequently select an option only by providing the 60–day notice to all employees of the option the employer intends to implement."[3] 29 C.F.R. § 825.200(e). *Bachelder* reasoned that "[e]mployees would not realize that their employer had 'fail[ed] to select' a calculating method, such that they would be entitled to notice of a belated selection, unless the employer had a duty to provide timely information initially regarding its selection." 259 F.3d at 1128. According to the court's interpretation, the employer's "failure to select" a calculating method "is best understood to include the failure to inform employees of its selection." *Id.* "The only sensible reading of the regulations taken as a whole, therefore, is that an employer's 'selection' of a calculating method must be an open rather than a secret act, necessarily carrying with it an obligation to inform its employees thereof." *Id.*

Applying its reasoning to the facts before it, the *Bachelder* court held that the employer's failure to *inform* the employee that it had chosen the "rolling" method in effect amounted to a failure to *select* a method at all. *Id.* When an employer never selects a method in the first place, the regulations require that "the option that provides the most beneficial outcome for the employee" shall be used, 29 C.F.R. § 825.200(e), which in *Bachelder,* as in this case, was the "calendar year" method.

**(b) The Scope of *Bachelder's* Holding**

Defendant argues that even if this Court adopts *Bachelder,* that case only requires that an employer's selection of its method be open and not a secret. *See Bachelder,* 259 F.3d at 1129 ("We therefore conclude that an initial selection of a method for calculating the leave year must be an open-not a secret-one before it can be applied to an employee's disadvantage.") The case does not, Defendant claims, require employers to affirmatively notify employees of the leave calculation method. *Bachelder* is less than clear in announcing its rule. On the one hand, in the quoted portion and elsewhere the decision seems to go no further than to require that the employer's selection "be an open one, not a secret kept from the employees," *id.* at 1127, that employers not be allowed "to conceal" the initial selection, *id.* at 1128, that the choice must not be "kept secret" from employees, *id.,* that "employees not be kept in the dark concerning their employer's initial selection," *id.,* and that the selection "must be an open rather than a

---

**3.** In a footnote, the court explained:

We note that no negative implication arises from the fact that the regulations are explicit in requiring 60–day notices in the event of a change in or failure to implement a leave year policy. In both of these instances, the nub of the regulation is the requirement that there be a 60–day period before a newly selected policy can take effect. A 60–day *advance* notice is not implicit in the "selection" requirement as read against the regulations' more general notice provisions and therefore had to be spelled out.
259 F.3d at 1128 n. 16.

secret act," *id.* However, after making these pronouncements, the court went on to explain that the requirement that the selection be open and not secret "necessarily carr[ies] with it an obligation to inform" the employees of the method selected, *id.*, and that "the employer's 'failure to select' a method is best understood to include the failure to inform employees of its selection." *Id.* This Court therefore construes *Bachelder* to hold that employers are obligated to take active steps to inform employees of the method selected for calculating leave.

### (c) What Other Courts Say On *Bachelder*

Only a few cases have addressed the notice requirement announced in *Bachelder* since that case was decided in 2001. Perhaps the paucity of decisions on the notice question stems from the ease with which both employers and employees can prevent disputes as in the instant case. An employer keen on avoiding litigation can do so by (a) compiling an employee handbook setting forth FMLA information, including the employer's selected leave calculation method, and (b) issuing the handbook to all employees and requiring them to sign a receipt. Careful employers would take these simple steps, thereby averting the prospect of having to defend against lawsuits like this one. Moreover, the Court imagines that even when employers fail to protect themselves, most employees will, before taking FMLA leave, ask and receive satisfactory answers to simple questions such as "How much leave do I get?" or "When do I have to return to work?" All legal issues aside, common sense on the part of both employers and employees probably makes disputes like this case rare-which unfortunately gives the Court few on-point judicial opinions upon which to rely.

The Court has found only one opinion that discusses *Bachelder* approvingly and adopts its holding that employers must notify employees of their FMLA leave calculation method.[4] In that case, *Dodaro v. Village of Glendale Heights,* No. 01–C–6396, 2003 WL 1720030 (N.D.Ill. Mar.31, 2003), the employer's employee manual did not discuss FMLA leave calculation methods. Unlike *Bachelder,* though, when the plaintiff in *Dodaro* submitted a request for FMLA leave, the employer gave the plaintiff a separate written document expressly stating that the rolling method would be used. *Id.* at *7. The court found this later document insufficient to satisfy § 825.301(a)(1). *Id.* "To be consistent with a goal of enabling employees to stay aware of the applicable rules," the court opined, "the regulation should be construed as re-

---

**4.** Plaintiff cites *Fry v. First Fidelity Bancorporation,* No. 95–6019, 1996 WL 36910 (E.D.Pa. 1996), a pre-*Bachelder* decision, in support of the proposition that employers must provide individual notice to employees of the method of leave calculation. *Fry,* however, does not go as far as *Bachelder.* In *Fry,* the employer's handbook stated that employees were entitled to 16 weeks of FMLA leave, but in practice, the employer counted only the first 12 weeks as FMLA-covered leave. *Id.* at *2. The court held that employers must notify employees in such situations where "there is an apparent conflict between the employer's policy and the employees' FMLA rights." *Id.* at *5. No similar conflict exists in the instant matter.

Moreover, the court in *Fry* never reached the decisive issue in this case. The defendant in *Fry,* like Defendant in this case, "argue[d] strenuously that neither the FMLA nor its implementing regulations requires [an employer] to notify its employees of the method it uses to determine the twelve month period for calculating an employee's eligibility for 12 workweeks of family leave." *Id.* at *3. The court expressly avoided deciding this question, stating: "Although that contention may or may not be valid, it does not appear to be relevant to plaintiff's claim in this action, as set forth above. Consequently, we see no need to discuss that issue in connection with the pending motion." *Id.*

quiring that the election [of the method of leave calculation] be incorporated in a *permanent written document* such as a handbook, not simply conveyed in what could be a one-time, stand-alone, 'other document.'" *Id.*[5] (emphasis added) *Dodaro* thus goes beyond *Bachelder* to require not only that the employer provide notice, but also that the notice must be included in the employer's permanent policy handbook.

· A few other decisions have criticized the rationale undergirding *Bachelder* and concluded that the FMLA does not require employers to notify employees of the method for calculating leave. The Court finds these decisions unpersuasive. The first of these, *Kelso v. Corning Cable Systems International Corp.*, 224 F.Supp.2d 1052 (W.D.N.C.2002), came after but did not cite *Bachelder*. The plaintiff in *Kelso* argued that the employer "was under an obligation to provide notice of the method used to calculate FMLA leave." *Id.* at 1057. In contrast to *Bachelder's* exhaustive analysis, the *Kelso* court devoted only two sentences to the question, stating: "The court can find no such statutory requirement. The only regulation that addresses that issue is part 825.200(d)(1), which provides that notice be given if the employer changes calculation periods."

Another case Defendant cites, *Phillips v. Leroy–Somer North America*, No. 01–1046–T, 2003 WL 1790941 (W.D.Tenn. Mar.28, 2003), expressly rejected *Bachelder*. "Section 825.301(a)(1) does not go so far so to require the specific notice to which the Ninth Circuit refers," the court wrote. *Id.* at *5. "Section 825.301(a)(1) states merely that, if written materials regarding benefits are given to employees, such as an employee handbook, those materials must contain 'information on FMLA rights and responsibilities and the employer's policies regarding the FMLA.'" *Id.* Like *Kelso*, *Phillips* devoted only brief, summary attention to the notice issue. In this Court's view, *Phillips'* analysis falls short in comparison to *Bachelder's* extensive and persuasive reasoning leading to the conclusion that the obligation to provide information on FMLA rights, responsibilities, and policies carries with it a requirement to give employees notice of the method used to calculate their leave period.

### (d) This Court Adopts the *Bachelder* Rule

■ The Court agrees with *Bachelder's* conclusion that employers are required to notify employees of the method of FMLA leave calculation, and that when employers fail to do so, leave is to be calculated in the manner most beneficial to the employee. In reaching this decision, the Court relies on and adopts the rationale set forth in the *Bachelder* decision. The Court disagrees with Defendant's characterization of the *Bachelder* decision as an example of the Ninth Circuit overstepping its authority to interpret the FMLA and its accompanying regulations. Rather, the Department of Labor's own comments issued in conjunction with the FMLA regulations comport with *Bachelder's* holding. *See* 60 Fed.Reg. 2180, 2200 (Jan. 6, 1995) ("Employers must inform employees of the applicable method for determining FMLA leave entitlement when informing employees of their FMLA rights.") Although the Ninth Circuit draws frequent criticism for conjuring new rules of law out of thin air, its decision in *Bachelder* is rooted in solid ground.

---

**5.** As discussed later in this Opinion, the Court deems Defendant's Summary of Benefits form, which expressly stated that Defendant had selected the rolling method, to be something akin to an employee handbook or other similar, pre-existing policy document and not the sort of "one time, stand-alone" document criticized in *Dodaro*.

**(2) Whether Defendant Satisfied *Bachelder* by Providing Notice Remains a Disputed Issue of Material Fact**

Defendant argues that even if this Court decides to adopt *Bachelder's* holding, Defendant has satisfied that decision's requirement by providing notice to Plaintiff that it had selected the rolling method. Defendant points to a form titled "Fuel Systems LLC Summary of Benefits for Active Salaried Employees" (the "Summary of Benefits" form) that it says it distributed to new employees when hired. Under the heading "Family and Medical Leave (FMLA)," the form states:

> Granted as required by law up to 12 weeks of paid or unpaid family and medical leave to full-time active employees after one year of service and who have worked 1250 hours during the preceding 12 months.

> —Measured by *Rolling Year* period (measured backwards from the date an employee uses FMLA).

(Def.'s Br. Supp. Mot. Summ. J. Ex. C.) (emphasis added) Unlike in *Bachelder*, where the employer never mentioned its chosen method for calculating leave, Defendant's Summary of Benefits form expressly announces that the company has adopted the rolling method. Plaintiff, however, asserts that this form is substantively inadequate to convey notice, and moreover, that she never received the form. The Court addresses these arguments in the discussion that follows and concludes that although the Summary of Benefits form comprises a handbook-style document that adequately conveys notice to its readers, whether Defendant provided the form to Plaintiff-and thus, whether Defendant provided her notice of the leave calculation method-remains an unresolved fact question.

**(a) The Summary of Benefits Form is Substantively Adequate to Convey Notice**

■ Plaintiff contends that the Summary of Benefits form is insufficient in substance to satisfy the notice requirement arising under *Bachelder* and the regulatory provisions upon which it relied. As the Court has already discussed, 29 C.F.R. § 825.301(a)(1) states that employers who issue written guidelines to all employees in the form of employee handbooks or similar documents must "incorporate information on FMLA rights and responsibilities and the employer's policies regarding the FMLA." Section 825.301(a)(2) requires that if "an employer does not have written policies, manuals, or handbooks describing employee benefits and leave provisions, the employer shall provide written guidance to an employee concerning all the employee's rights and obligations under the FMLA." *Bachelder* determined that the employer's leave calculation method is among the FMLA "rights and obligations" of which employers must notify employees.

Defendant has issued two documents that Plaintiff says can be characterized as employee handbooks or similar documents concerning employee benefits within the meaning of 29 C.F.R. § 825.301(a)(1): first, an "Employee Reference Book" (Pl.'s Br. Resp. Mot. Summ. J. Ex. R.), and second, a document titled "Your Benefits— A Plan Designed to Provide Security for Employees of Fuel Systems, LLC." (*Id.* Ex. O.) Neither of these publications mentions Defendant's method for calculating FMLA leave and, according to Plaintiff, the Summary of Benefits form does not qualify as an employee handbook or similar document for purposes of § 825.301(a)(1). Therefore, Plaintiff maintains, Defendant was required to issue notification of the leave calculation method to Plaintiff individually in the form of sepa-

rate "written guidance" pursuant to § 825.301(a)(2), which it never did.

The Court rejects this argument and finds instead that the Summary of Benefits form does constitute "written guidance to employees concerning employee benefits or leave rights, such as in an employee handbook . . . or other document" within the meaning of § 825.301(a)(1). The form's title indicates that it sets forth policies for "salaried employees," evidently meaning *all* such employees, not just one individual. Moreover, Defendant says it makes a practice of including the form in the orientation folder each new salaried employee receives. (Ritsema Aff. ¶ 1, Def.'s Br. Supp. Mot. Summ. J. Ex. C.) The Summary of Benefits form is a type of written guidance directed toward a group of employees—plural—as opposed to the type of individualized guidance provided to "an employee"—singular—pursuant to § 825.301(a)(2). An employer can issue § 825.301(a)(1) group guidance via multiple publications, as even Plaintiff acknowledges in characterizing both the "Employee Reference Book" and the document titled "Your Benefits–A Plan Designed to Provide Security for Employees of Fuel Systems, LLC" as § 825.301(a)(1) documents. The Summary of Benefits form thus functions as a handbook-like document for purposes of the FMLA regulations.

In terms of its substantive contents, there can be no question that the Summary of Benefits form adequately announces the method of leave calculation Defendant selected: "Measured by Rolling Year period (measured backwards from the date an employee uses FMLA)." (Def.'s Br. Supp. Mot. Summ. J. Ex. C.) This notice is sufficiently clear, despite Plaintiff's protestations that it provides only "skeletal information" and is "buried on page 4" of the form. (Pl.'s Br. Resp. Mot. Summ. J. at 10.) The Court can find no support for the notion that employers must provide greater detail than what is found in the Summary of Benefits form.

**(b) Whether Plaintiff Received the Summary of Benefits Form Remains a Disputed Question of Material Fact**

Plaintiff next contends that Defendant failed to notify her of its leave calculation method. Plaintiff claims that "she never received a copy of the Summary of Benefits sheet" stating that Defendant used the rolling method. (Pl.'s Br. Resp. Mot. Summ. J. at 11.) For its part, Defendant has provided testimony that it includes the Summary of Benefits form in the orientation folder it gives to each new salaried employee. (Ritsema Aff. ¶ 1.) Plaintiff admitted in her deposition to receiving an orientation folder and receiving, filling out, and returning other materials in the folder such as her direct deposit form, tax withholding form, I–9, flexible spending benefits plan, and confidentiality agreement. (Austin Dep. at 26–32, Pl.'s Br. Resp. Mot. Summ. J.) However, she testified at her deposition that she did not "recall" receiving the Summary of Benefits form and to her knowledge had never seen it before. (*Id.* at 32, 33, 41, 43.) Plaintiff's affidavit contains more forceful denials:

5. Fuel Systems never provided me with training or instruction relative to its method for calculating FMLA leave, nor did Fuel Systems ever provide me with a copy of its FMLA policy.

6. At no time during my employment did Defendant Fuel Systems inform me there were different methods for calculating leave, or that Defendant followed the "rolling year" method for calculating leave.

7. It was not until after Fuel Systems terminated my employment, and in preparation of filing suit against it, that

I learned there were different calculation methods and learned that Fuel Systems claimed it followed the "rolling year" method.

(Austin Aff., Pl.'s Br. Resp. Mot. Summ. J.) Moreover, Plaintiff notes that although Defendant requires employees to sign a statement acknowledging receipt of the Employee Reference Book, employees are not required to sign receipts for new employee orientation folders, and Defendant has produced no receipt indicating that Plaintiff received the Summary of Benefits form.

Additional factual uncertainty arises due to the unconventional circumstances in which Defendant hired Plaintiff. Defendant's argument, in essence, is that Plaintiff must have received the Summary of Benefits form because Defendant includes that form in the packet it provides to all new salaried employees when they are hired. However, Plaintiff came to work at Defendant in an atypical manner, starting out as a temporary employee working through an agency, and only later becoming an actual employee of Defendant. It could be that in this unusual, two-step process, Defendant may not have followed its normal employee orientation procedures and may have neglected to give Plaintiff the Summary of Benefits form.

In light of these unresolved factual questions, the Court cannot determine as a matter of law that Defendant provided Plaintiff with notice of its leave calculation method and thereby fulfilled its obligations under the *Bachelder* rule. Accordingly, Defendant's motion for summary judgment must be denied with respect to the FMLA claim and a factfinder must determine whether or not Plaintiff received the Summary of Benefits form.[6]

### (3) *Ragsdale*—Prejudice

■ In order to recover under the FMLA, an employee must prove that he or she was actually prejudiced by an employer's violation. *Ragsdale v. Wolverine World Wide*, 535 U.S. 81, 90, 122 S.Ct. 1155, 1162, 152 L.Ed.2d 167 (2002). Defendant argues that even if the Court adopts *Bachelder*, and even if it finds that Defendant failed to provide notice in accordance with that decision, Plaintiff cannot show prejudice under *Ragsdale*. In Defendant's view, even if Plaintiff had known of Defendant's selection of the rolling method, she still could not have returned to work within 12 weeks of taking leave. Plaintiff's doctor did not clear her to return to work on a part-time basis until January 16, 2003, and did not clear her to return to full-time work until February 3, 2003, some 16½ weeks after her leave began. Therefore, Defendant contends, Plaintiff's FMLA claim must fail due to lack of *Ragsdale* prejudice.

Plaintiff offers two arguments in response: first, that *Ragsdale* does not require a showing of prejudice under the regulatory provision applicable in this case, 29 C.F.R. § 825.200(e), and second, that even if such a showing is required, Plaintiff has in fact suffered prejudice as a result of Defendant's alleged failure to provide notification of its FMLA leave policy.

■ The Court rejects Plaintiff's first argument, i.e., that a showing of prejudice is not required. Although the specific regulatory provision at issue in *Ragsdale* differed from that in this case, *Ragsdale* addressed "the FMLA's cause of action" generally when it recognized employees' "burden of proving . . . [a] real impair-

---

**6.** If a factfinder determines that Defendant provided the Summary of Benefits form to Plaintiff, then Defendant fulfilled its obli-

gations under *Bachelder* and Plaintiff's FMLA claim fails.

ment of their rights and resulting prejudice." 535 U.S. at 90, 122 S.Ct. at 1162. Because any FMLA action requires a showing of prejudice, *Ragsdale* invalidated a regulatory provision that purported to relieve employees of this burden. *Id. See also Phillips v. Leroy–Somer North Am.*, No. 01–1046–T, 2003 WL 1790941, at *5 (W.D.Tenn. Mar.28, 2003) (stating, in a case implicating 29 C.F.R. § 825.301, that after *Ragsdale*, "the FMLA provides no relief unless the plaintiff has been prejudiced by an alleged violation").

■ With respect to Plaintiff's second argument, however, an issue of material fact remains in dispute regarding whether Plaintiff experienced prejudice. Even Defendant's cases acknowledge that no prejudice occurs as a matter of law only when an employee "cannot show" any evidence that she could or would have returned to work any sooner than she did. *See Kelso*, 224 F.Supp.2d at 1057; *Phillips*, 2003 WL 1790941, at *5; *Cehrs*, 155 F.3d at 784–85. Plaintiff claims that had she known that under the rolling method, she was required to return to work by January 1, 2003, she could and would have done so. (Pl.'s Br. Resp. Mot. Summ. J. at 14–15.) She contends that as of December 16, 2002, her symptoms had largely cleared up, she was able to resume her normal activities, and she would have returned to work if necessary to keep her job. (*Id.* at 15.) Had she been aware of the deadline imposed by the rolling method, she argues, she might have tried to schedule her doctor appointments earlier or sought a second opinion as to when she could return to work. And in fact, a doctor's certification to return to work was not even necessary because Defendant never expressly required it pursuant to 29 C.F.R.

§ 825.310(e). Plaintiff claims that had she known of the rolling method deadline, she may not have decided to have surgery in the first place, given the risk of losing her job and her family's health insurance benefits. Based on these arguments, the question of whether Plaintiff suffered *Ragsdale* prejudice remains unresolved and therefore is inappropriate for decision on summary judgment.

## B. Age Discrimination Claim

■ The second claim in Plaintiff's lawsuit is for age discrimination. Plaintiff claims that Defendant discriminated against her based on her age when it terminated her employment and allegedly replaced her with a younger employee, Lori Seeley. She has sued under the ADEA and Michigan's Elliot–Larsen Act.[7]

In an age discrimination case, the plaintiff bears the burden of proving a prima facie case and at all times retains the burden of persuasion as to the ultimate issue of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). ADEA claims are analyzed using the three-part *McDonnell Douglas* test. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the first stage of that test, the plaintiff must establish a prima facie case of discrimination, which in the context of the ADEA requires a showing that she was: (1) a member of the protected class (i.e., over age 40); (2) subjected to an adverse employment action; (3) qualified for the position; and (4) replaced by a younger person. *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992). A prima facie case of discrimination gives rise to a presumption of discrim-

---

**7.** The legal analysis for both statutes is the same. *See Waleson v. American Seating Co.*, No. 1:94–CV–458, 1995 WL 571947, at *2 (W.D.Mich.1995) ("For analytical purposes, Michigan's Elliot–Larsen Act resembles federal law, and utilizes the same evidentiary burden as ADEA cases.").

ination. *Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 584 (6th Cir.2002). If the plaintiff establishes a prima facie case, then under the second stage of the *McDonnell Douglas* test, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the action. *Id.* If the defendant meets its burden, then in the *McDonnell Douglas* test's third stage, the presumption of discrimination drops away and the burden shifts back to the plaintiff to show that the employer's reason was a mere pretext for discrimination. *Id.*

Defendant argues that it is entitled to summary judgment on the age discrimination claim for two reasons: (1) Plaintiff was not replaced, and (2) Defendant had legitimate, non-discriminatory reasons for terminating Plaintiff. As explained below, the Court concludes that whether Plaintiff was replaced remains a fact question unsuited for resolution on summary judgment. However, Defendant is entitled to summary judgment on this claim because Plaintiff's failure to report to work after Defendant believed her leave had expired was a legitimate reason for terminating her unrelated to age discrimination, and Plaintiff has no evidence showing that this reason was a pretext for age discrimination.

**(1) Whether Plaintiff Was Replaced**

 It is undisputed that Plaintiff establishes the first three elements of a prima facie case: she was over 40, she was fired, and she was qualified for the job. However, Defendant contends that Plaintiff cannot establish the fourth element: that she was replaced by a younger person.[8] In Defendant's view, Plaintiff was not replaced by anyone; rather, her posi-

tion was simply eliminated and its job functions distributed among remaining employees.

 Defendant says that it terminated Plaintiff due to "the need to restructure its work force and eliminate certain positions." (Def.'s Br. Supp. Mot. Summ. J. at 18.) An employee who is terminated during the course of a workforce reduction and whose duties are spread among remaining employees has not been "replaced" for ADEA purposes. *See Lilley*, 958 F.2d at 752 (6th Cir.1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."); *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."); *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1117 (6th Cir.1980) ("Plaintiff was not replaced; his former duties were assumed by Alexander, who performed them in addition to his other functions.").

Two unresolved fact issues preclude ruling as a matter of law in Defendant's favor on the issue of whether Plaintiff was replaced. First is the question of whether Lori Seeley merely assumed Plaintiff's job duties and performed them in addition to her other tasks, in which case Plaintiff was not replaced, or whether Seeley was reassigned out of her old position and into Plaintiff's position, in which case Seeley replaced Plaintiff. Plaintiff contends that Seeley's former position was being eliminated as a result of Defendant's decision to

---

**8.** Plaintiff alleges that she was replaced by Lorrie Seeley, who was 29 years old on the

date Plaintiff was terminated.

transfer production for customers other than Ford (the account that Plaintiff serviced) to out-of-state facilities. Plaintiff appears to maintain that Seeley stopped performing her former job functions entirely and took on Plaintiff's functions with the Ford account.

A second unresolved fact question is whether Defendant underwent a reorganization or, instead, a reduction in force. "It is important to clarify what constitutes a true work force reduction case. A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Barnes,* 896 F.2d at 1465. *See also Waleson v. American Seating Co.,* No. 1:94–CV–458, 1995 WL 571947, at \*1 (W.D.Mich. Aug.10, 1995) (employer initiated a "company-wide work force reduction due to economic necessity," resulting in the consolidation of various jobs and the elimination of 17 salaried positions, including the plaintiff's, whose job responsibilities were distributed among remaining employees). There is no question that Defendant was reorganizing its business, but that testimony of Defendant's plant manager, Rick Claypool, suggests that no plan existed to eliminate employees other than through voluntary attrition. (Claypool Dep. at 53–54, 59, Pl.'s Br. Resp. Mot. Summ. J.) Claypool has gone so far as to say that the alleged reorganization did not have anything to do with Plaintiff's termination. (*Id.* at 5–6.) This case thus differs from the workforce reduction cases on

which Defendant relies. Here, there is no evidence to support Defendant's contention that it had planned to eliminate one of its two customer support positions and terminate either Plaintiff or Seeley, and that Plaintiff was terminated in accordance with that plan.[9] (Def.'s Br. Supp. Mot. Summ. J. at 18.)

Because of these unresolved fact questions regarding whether Plaintiff was replaced, the Court cannot rule as a matter of law that Plaintiff fails to establish the fourth element of a FMLA prima facie case. Therefore, it is necessary to proceed to the next step of the analysis.

### (2) Legitimate, Non–Discriminatory Reason for Termination

If a plaintiff establishes the four requirements of a prima facie age discrimination case, a defendant can defeat the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the action. *Cicero v. Borg–Warner Automotive, Inc.,* 280 F.3d 579, 584 (6th Cir.2002). If the defendant meets its burden of production, the burden reverts to the plaintiff to show that the employer's reason was a mere pretext to cover up discrimination. *Id.*

Defendant argues that it had two legitimate, nondiscriminatory reasons for terminating Plaintiff: (1) it was consolidating two customer service positions into one; and (2) Plaintiff had exhausted her FMLA leave entitlement without reporting back to work.[10] The Court has already deter-

---

**9.** Even if a defendant can demonstrate that it instituted a workforce reduction, a plaintiff can show that the reduction was not the reason for his or her discharge by adducing "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes,* 896 F.2d at 1465. "Further, a plaintiff could attempt to show that the force reduction was itself pretextual." *Id.* at 1465 n. 10. However,

"[t]he mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of age discrimination." *LaGrant v. Gulf & Western Mfg.Co.,* 748 F.2d 1087, 1090 (6th Cir.1984).

**10.** Defendant also asserts that Plaintiff had a history of complaining about the demands of her job and had threatened to quit.

mined that the first reason Defendant asserts remains a matter of factual dispute, as evidence suggests that Defendant's purported reorganization plan may have had nothing to do with Plaintiff's termination. However, Defendant's second articulated reason is legitimate and nondiscriminatory. An employee may be terminated for failing to return to work after her FMLA leave has expired. An employee who exceeds the permitted FMLA leave time has no right to be restored to her job. *See* 29 C.F.R. § 825.214(b); *Hicks v. Leroy's Jewelers, Inc.*, No. 98–6596, 2000 WL 1033029, at *5 (6th Cir. July 17, 2000); *Green v. Alcan Aluminum Corp.*, No. 98–3775, 1999 WL 1073686, at *2 (6th Cir. Nov.16, 1999). Plaintiff does not contest Defendant's claim that it consistently terminates employees who exhaust their FMLA leave entitlement and fail to return to work. (Def.'s Br. Supp. Mot. Summ. J. at 19.) In fact, Lori Seeley, whom Plaintiff alleges replaced her, was later terminated for this very reason. (*Id.*)

Even if a factfinder ultimately determines that Defendant failed to notify Plaintiff of its leave calculation method and therefore violated the *Bachelder* rule, Defendant's rationale for terminating Plaintiff was still legitimate and non-discriminatory. Defendant had selected the rolling method of leave calculation and had documented that choice in its Summary of Benefits form. Plaintiff indisputably exceeded her allotted leave as calculated using the rolling method, and that constituted grounds for firing her. Defendant thus believed in good faith that Plaintiff had committed a violation warranting termination and legitimately fired her for that reason. Now, if it turns out that Defendant failed to provide notice as required by *Bachelder*, then Plaintiff's leave must be calculated using the more generous calendar year method instead of the rolling method. But even if Defendant was mistaken as to which method applied, Defendant's good faith belief at

the time that it could terminate Plaintiff comprises a legitimate, non-discriminatory reason sufficient to rebut Plaintiff's prima facie case. *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n. 3 (11th Cir.1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir.1995) ("Pretext is not demonstrated by showing simply that the employer was mistaken."); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (stating that for purposes of discerning a legitimate, non-discriminatory reason to rebut a prima facie discrimination claim, the inquiry is limited to whether the employer *believed* that the employee committed a terminable offense, not whether the employee in fact did so); *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) ("no matter how mistaken the firm's managers, . . . our inquiry is limited to whether the employer gave an honest explanation of its behavior") (internal quotation marks and citation omitted); *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not [due to a discriminatory reason].")

■ Since Defendant has articulated a legitimate, nondiscriminating reason for terminating Plaintiff, the burden now shifts to Plaintiff to show that this reason is a mere pretext. A genuine issue of fact regarding pretext, sufficient to avoid summary judgment, will be found if an employee shows that: (1) the proffered reason has no basis in fact; (2) the proffered reason did not actually motivate the discharge; or (3) the proffered reason is insufficient to explain the discharge. *Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579,

589 (6th Cir.2002); *Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 471 (6th Cir.2002).

 Under the first and third methods of showing pretext, the fact finder may infer discrimination from the circumstances. *Cicero,* 280 F.3d at 589 (citing *Kline v. Tenn. Valley Auth.,* 128 F.3d 337, 346 (6th Cir.1997) ("[W]hen a plaintiff proves that the defendant's proffered reasons either have no basis in fact or are insufficient to motivate discharge, a permissive inference of discrimination arises.")). The Sixth Circuit has further explained that the first method "consists of evidence that the reasons given by the employer simply did not happen." *Peters,* 285 F.3d at 471. The third method "ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* at 471–72 (internal quotation marks and citation omitted) Under the second method, the plaintiff may not rely exclusively on her prima facie evidence, but instead must introduce some further evidence of discrimination. *Cicero,* 280 F.3d at 589.

 Plaintiff fails to meet her burden of showing pretext under any of the three methods. With respect to the first method, the proffered reason for Plaintiff's termination—that she failed to report to work upon the expiration of her FMLA leave—has a basis in fact. Plaintiff admits to remaining on leave longer than 12 weeks, which exceeded the time permitted under Defendant's rolling method of leave calculation. Regarding the second method, Plaintiff has introduced no further evidence that the proffered reason did not actually motivate her discharge. Plaintiff points out that she had received accolades

and raises recognizing her good job performance and posits that it is "difficult to understand" how Defendant would decide to terminate her in light of these accomplishments. (Pl.'s Br. Resp. Mot. Summ. J. at 22.) However, Plaintiff lacks any evidence, beyond that supporting her prima facie case, that she was discriminated against based on her age. She even admitted in her deposition that her only evidence of age discrimination is that which supports her prima facie case, i.e., that Seeley was younger than she was. (Austin Dep. at 163–67.) With respect to the third method, Plaintiff fails to show that the proffered reason is insufficient to explain the discharge. Indeed, Plaintiff does not challenge Defendant's claim that it habitually terminated *all* employees who failed to report to work after their FMLA leave expired. Businesses need to consistently enforce disciplinary policies because selective enforcement would open the door to discrimination allegations. Plaintiff's absence after her leave expired thus sufficiently explains Defendant's motivation for firing her.

In summary, although Plaintiff may be able to make out a prima facie case of age discrimination, Defendant has provided a legitimate, nondiscriminatory reason for terminating Plaintiff, which Plaintiff has failed to rebut. Therefore, under the *McDonnell Douglas* analysis, Defendant is entitled to summary judgment on Plaintiff's age discrimination claim.

## C. Disability Discrimination Claim

 Defendant seeks summary judgment on Plaintiff's disability discrimination claim, in which Plaintiff alleges that Defendant violated the ADA and PWDCRA by failing to make accommodations for, and terminating her employment because of, her health condition.[11] The ADA prohibits

11. The legal analysis under the ADA and PWDCRA is the same. *Cotter v. Ajilon Servs.,*

employment discrimination based on an employee's disability. Specifically, the ADA mandates that: "No covered entity shall discriminate against an individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity," and "denying employment opportunities to a[n] ... employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(A)-(B).

■ To defeat an employer's motion for summary judgment in response to an ADA claim, an employee must first make out a prima facie case of discrimination by establishing the following elements: (1) she is disabled; (2) she is otherwise qualified for her previous position with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) she was replaced or her position remained open while the employer looked for other applicants. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 936 (6th Cir.2000); *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir.1996). The burden then shifts to the employer to provide a non-discriminatory explanation for the employ-

ment decision. *Monette*, 90 F.3d at 1186. If the employer offers what appears to be a legitimate explanation, the employee then has the burden of "showing that the proffered explanation is pretextual." *Id.*

■ Defendant's summary judgment motion asserts that Plaintiff fails to establish the first and fifth elements of a prima facie disability discrimination claim. With respect to the fifth element, Defendant argues that Plaintiff was not replaced. The Court rejects this argument, having already concluded that whether Defendant replaced Plaintiff remains a disputed issue of material fact that bars summary judgment in Defendant's favor. Next, with respect to the first element, Defendant contends that Plaintiff did not have a "disability." The Court agrees with Defendant and finds as a matter of law that Plaintiff was not disabled. Therefore, Defendant is entitled to summary judgment on Plaintiff's disability discrimination claim.

■ A disability is defined as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Plaintiff does not appear to argue that she was disabled under subsections (B) or (C), but does claim that she was disabled under subsection (A) of the definition. In order to recover under the ADA, a plaintiff must have a disability at the time of the alleged discriminatory act. *See Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir.1996). The relevant question is whether Plaintiff was disabled on the date of her termination. Her condition prior to the surgery is irrelevant to this analysis.

*Inc.*, 287 F.3d 593, 597 (6th Cir.2002).

In deciding whether Plaintiff had a disability on her termination date, the Court considers the following three factors: (1) whether the condition constitutes a physical impairment; (2) whether the life activity purportedly curtailed as a result of the physical impairment constitutes a major life activity under the ADA; and (3) whether the physical impairment substantially limits this major life activity. *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998).

A physical impairment is "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, muscoloskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin and endocrine." 29 C.F.R. § 1630.2(h)(1). Plaintiff was diagnosed with an Arnold–Chiari malformation, which she describes as a congenital malformation of the brain whose symptoms can be treated by the surgery Plaintiff underwent but which cannot be cured. Because this condition is incurable, it existed on the date Plaintiff was terminated.

Major life activities are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Although this list provides helpful examples of major life activities, it is by no means exhaustive. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 780 (6th Cir. 1998). Plaintiff contends that her condition limited the major life activity of working, which is one of the activities enumerated in the list above.

Whether an individual is substantially limited in a major life activity is determined by considering the following factors: (i) the nature and severity of the impairment; (ii) the duration or expected pairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2). At this juncture of the analysis, Plaintiff's case fails to survive summary judgment. Plaintiff offers no evidence that any symptoms of the Arnold–Chiari malformation continued after the surgery. She testified that her "symptoms from before surgery were gone almost immediately" after surgery. (Austin Dep. at 139, 142–43.) Her doctor's notes from a November 1, 2002, appointment state that "[t]he patient says that the numbness and tingling that she has in both upper extremities, especially in the left side, is completely gone. The suboccipital headaches that she has have markedly improved." (*Id.*, Ex. 26, introduced at 144.) Notes from a January 16, 2003, appointment state: "The patient says that she has no headache, and the numbness and tingling that she had before surgery is completely gone." (*Id.*, Ex. 28, introduced at 147.) The FMLA section of Plaintiff's brief even argues that by December 16, 2000, "she was able to resume all her regular activities." (Pl.'s Br. Resp. Mot. Summ. J. at 15.) In *Cehrs*, the plaintiff's condition was a disability "because of the ongoing nature of the disease and its physiological impact even during its dormant stage." 155 F.3d at 780. In contrast, *Roush v. Weastec, Inc.*, 96 F.3d 840, 844 (6th Cir.1996), held that a plaintiff with a life-long "congenital" condition was not disabled when, after undergoing corrective surgery, she could produce no evidence that the condition continued to substantially limit a major life activity. The court noted that the "mere possibility" that symptoms would reoccur "is not sufficient to establish that her condition is substantially limiting." *Id.* This case resembles *Roush* because Plaintiff offers no evidence showing that,

on the date of her termination, she suffered any continuing symptoms or was likely to suffer future manifestations of her condition. At that time, her only limitations, if any, appear to have been associated with healing from the surgery, not the condition itself. Because there is no evidence of continuing effects of the impairment following surgery, Plaintiff was not limited in a major life activity. Accordingly, she was not disabled and cannot establish the first element of a prima facie ADA claim.

Even if Plaintiff could make out a prima facie case of disability discrimination, Defendant successfully rebuts it. In the section of this opinion discussing the age discrimination claim, the Court determined that Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff: she overstayed her FMLA leave period. The Court also determined that Plaintiff fails to show that this basis for termination was a pretext for discrimination. This reasoning applies with equal force to the disability discrimination claim. For these reasons, Defendant is entitled to summary judgment on Plaintiff's disability discrimination claim.

## IV. *Conclusion*

The Court will deny Defendant's summary judgment motion on the FMLA claim. The Court adopts the holding and rationale set forth in the Ninth Circuit's *Bachelder* opinion. According to that case, an employer must notify its employees of the method chosen for calculating FMLA leave. Whether Defendant provided such notice to Plaintiff remains a disputed issue of material fact, making summary judgment inappropriate on this claim. Also, whether Plaintiff experienced *Ragsdale* prejudice remains an unresolved fact question precluding summary judgment for Defendant on the FMLA claim.

The Court will grant Defendant's summary judgment motion on the age discrim-

ination claim because Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff. The Court will also grant Defendant's summary judgment motion on the disability discrimination claim, both because Defendant was not disabled within the meaning of the applicable law, and because the termination was grounded in a legitimate, non-discriminatory reason.

An Order consistent with this Opinion will follow.